IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 (Subchapter V) |
| PM Management-Killeen I NC LLC, | § | |
| *et al.*[1] | § | Case No. 24-30240 (sgj) |
| | § | (Jointly Administered) |
| Debtors. | § | |

---

RUSSELL F. NELMS, the Liquidating Trustee
of the PM Management Liquidation Trust,

      Plaintiff,

v.                                                        ADV. PROC. NO. 25-03049-sgj

ABRI HEALTH SERVICES, LLC; PM
MANAGEMENT – FREDERICKSBURG NC,
LLC; SCC EDINBURG LLC; WINDCREST SCC
LLC; SENIOR REHAB SOLUTIONS LLC;
ABRAHAM FRANKL; TINA HECHT; SENIOR
CARE CENTER MANAGEMENT
LLC;YEHUDAH  ARYEH ZUTLER; EPHRAIM
DIAMOND; and BARRY DERSHOWITZ.

      Defendants.

## **TRUSTEE'S FIRST AMENDED ADVERSARY COMPLAINT**

TO THE HONORABLE STACEY G.C. JERNIGAN
CHIEF UNITED STATES BANKRUPTCY JUDGE:

      The Plaintiff, Russell F. Nelms (the "Trustee"), acting in his capacity as the Liquidating

Trustee of the PM Management Liquidation Trust (the "Trust"), files this First Amended Adversary

Complaint against Abri Health Services, LLC ("Abri"); PM Management–Fredericksburg NC, LLC

---

[1] The Debtors in these subchapter V of chapter 11 cases ("Bankruptcy Cases"), along with the last four digits of each Debtor's EIN are PM Management - Killeen I NC LLC (3105) ("Killeen I"); PM Management - Killeen II NC LLC (3179) ("Killeen II"); PM Management - Killeen III NC LLC (3245) ("Killeen III"); and PM Management – Portfolio VIII NC LLC (3048) ("Portfolio VIII") (collectively, the "Debtors").

("Fredericksburg"); SCC Edinburg LLC; Windcrest SCC LLC (SCC Edinburg and Windcrest SCC are collectively referred to as "<u>Edinburg</u>"); Senior Rehab Solutions LLC ("<u>Senior Rehab</u>"); Senior Care Center Management LLC ("Senior Care"); Abraham Frankl ("Frankl"); Tina Hecht ("<u>Hecht</u>"); Yehudah Aryeh Zutler ("<u>Zutler</u>"); Ephraim Diamond ("<u>Diamond</u>") and Barry Dershowitz ("<u>Dershowitz</u>") and, in support thereof, respectfully shows the Court as follows:

## I.

## <u>INTRODUCTION</u>

1.      Prior to May 1, 2024, the Debtors operated three skilled nursing facilities ("<u>SNFs</u>") and one assisted living facility ("<u>ALF</u>") in and around Killeen, Texas (together, the "<u>Killeen Facilities</u>").

2.      In addition to patient healthcare, the Debtors provided rehabilitation, therapy, and other services to their patients and residents who are among the most vulnerable population.

3.      The Killeen Facilities were owned, operated and controlled 100% by their owner/operator, Abri. All management functions of the Killeen Facilities were handled by Abri.

4.      From approximately 2021, and until filing Chapter 11 in January 2024, the Debtors were in financial distress—they generated barely sufficient cash flow for rent and operations, and their liabilities exceeded their assets.

5.      From December 2022 to January 2024, through the continual  mismanagement of the Debtors by Abri, Frankl, Hecht, Diamond, Dershowitz, and Zutler, Defendants destroyed what little value the Killeen Facilities may have had left and drove them into an unnecessary receivership and then bankruptcy.

6.      One or more of the Defendants caused the Debtors to stop paying rent to their Landlord, HC Hill Country Associates, Ltd., H-C Associates, Ltd., and HC-RW Associates, Ltd.

(collectively, "Landlord") in order to force the Landlord to sell one or more of the facilities' real estate and buildings to Abri (or an affiliate) at distressed prices.

7.      Rather than capitulate, the Landlord put the Killeen Facilities into a receivership which then turned into this bankruptcy. This negligent miscalculation and mismanagement had disastrous but entirely foreseeable consequences for the Debtors, as detailed below, causing millions in damages to each of the Debtors including destroying their residual value as going concerns.

8.      The Defendants' wrongful conduct to the detriment of Debtors continued after the filing of the Bankruptcy Cases.

9.      The individual defendants owed fiduciary and other duties not only to the Debtors, but to the creditors of the Debtors because the Debtors were insolvent or in bankruptcy during all relevant times.

10.      At the request of Abri and the Debtors, the Court authorized Abri to continue to provide management, administrative, and support services during the pendency of the bankruptcy cases in exchange for payments from the Debtors' cash collateral.

11.      Under the guidance of Frankl, Diamond, and Dershowitz, Abri used estate money to benefit Abri and/or its non-debtor affiliates (but of no benefit to the Debtors), including, but not limited to, Fredericksburg, Edinburg, Senior Rehab, and Senior Care, thus making each of them responsible for the substantial damages to the Debtors.

12.      The Trustee respectfully seeks damages for injuries done to the Debtors arising from the reckless mismanagement of the Debtors' affairs prior to bankruptcy, as well as those arising from overcharges and mismanagement of the Debtors' moneys while in bankruptcy.

## II.

## PARTIES, JURISDICTION, AND VENUE

13.     Plaintiff is Russell F. Nelms, acting in his capacity as the Liquidating Trustee of the PM Management Liquidation Trust.

14.     Defendant Abri Health Services, LLC is a limited liability company organized under the laws of the State of Delaware. It has appeared in this bankruptcy case.

15.     Defendant PM Management–Fredericksburg NC, LLC is a limited liability company organized under the laws of the State of Texas with its principal office at 14841 Dallas Parkway, Suite 440, Dallas, TX 75254. It can be served by serving its registered agent for service of process, Amarillo Corporate Services, LLC, 500 S. Taylor, Suite 1100, LB 219, Amarillo, TX 79101.

16.     Defendant SCC Edinburg LLC is a limited liability company organized under the laws of the State of Texas with its principal office at 14841 Dallas Parkway, Suite 440, Dallas, TX 75254. It can be served by serving its registered agent for service of process, Amarillo Corporate Services, LLC, 500 S. Taylor, Suite 1100, LB 219, Amarillo, TX 79101.

17.     Defendant Windcrest SCC LLC is a limited liability company organized under the laws of the State of Texas with its principal office at 14841 Dallas Parkway, Suite 440, Dallas, TX 75254. It can be served by serving its registered agent for service of process, Amarillo Corporate Services, LLC, 500 S. Taylor, Suite 1100, LB 219, Amarillo, TX 79101.

18.     Defendant Senior Rehab Solutions LLC is a limited liability company organized under the laws of the State of Delaware with its principal office at 40 E. Division Street, Suite A, Dover, DE 19901. It can be served by serving its registered agent for service of process, Amarillo Corporate Services, LLC, 500 S. Taylor, Suite 1100, LB 219, Amarillo, TX 79101.

19.    Defendant Senior Care Center Management LLC is a limited liability company organized under the laws of the State of Texas with its principal office at 14841 Dallas Parkway, Suite 440, Dallas, TX 75254. It can be served by serving its registered agent for service of process, Amarillo Corporate Services, LLC, 500 S. Taylor, Suite 1100, LB 219, Amarillo, TX 79101.

20.    Defendant Tina Hecht is an individual resident of Texas. At times relevant to this adversary complaint, Hecht was the CEO of the Debtors and Abri and therefore owed the Debtors duties of care and loyalty.

21.    Defendant Yehudah Aryeh Zutler is an individual resident of New York. On information and belief, Zutler functioned as an officer of Abri and one or more of the Debtors and therefore owed Debtors duties of care and loyalty

22.    Defendant Ephraim Diamond is an individual resident of New York. At times relevant to this adversary complaint, Diamond was a director of Abri and each of the Debtors and therefore owed the Debtors duties of care and loyalty.

23.    Defendant Barry Dershowitz is an individual resident of New York.  At times relevant to this adversary complaint, Dershowitz was a director of Abri and each of the Debtors and therefore owed the Debtors duties of care and loyalty.

24.    Defendant Abraham Frankl is an individual resident of New York. On information and belief, at all times relevant to this adversary complaint, Frankl was instrumental in directing the board of directors in all things relevant hereto and therefore owed the Debtors duties of care and loyalty.

25.    This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), and (O).

To the extent any aspects of this Complaint are non-core, the Trustee consents to the entry of findings of fact and final relief by this Court.

26.     This Court has personal jurisdiction over each of the Defendants under 28 U.S.C. §§ 1334(b), 1409(a), and Fed. R. Bankr. P. § 7004(f).

27.     Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

## III.

## PROCEDURAL BACKGROUND

28.     On January 29, 2024 (the "Petition Date"), Debtors Killeen I, Killeen II, Killeen III, and Portfolio VIII filed petitions under Subchapter V of Title 11, respectively, 24-30240-11, 24-30244-11, 24-30246-11, and 24-30247-11.

29.     On February 6, 2024, the Court entered an order for joint administration of the cases under this lead case.

30.     On April 29, 2024, the Court entered findings of fact and an order confirming the Debtors' Third Amended Plan of Reorganization. (together, the "Confirmation Order").

31.     The Plan, as supplemented, became effective on May 1, 2024, and, pursuant thereto, all Trust Property (as defined in the Plan) vested with the Trust, including the property made the subject of this adversary complaint. Dkt. 233 (Notice of Effective Date); *see* Confirmation Order [Dkt. 206] at ¶ 32 (vesting all estate property with the Liquidation Trust on the Effective Date of the Plan).

32.     The confirmed Plan vested the Trust with certain assets of the estate, including causes of action that arose on or prior to May 1, 2024, the Effective Date of the Plan. *See* Plan [Dkt. 206], Art. II, p. 7 (defining Causes of Action); *see id.* at Art. VII (establishing Trust with exclusive authority to prosecute and liquidate Causes of Action).

---

33.     Without limitation, the estates' statutory turnover powers and all causes of action owned by the Debtors were preserved and passed to the Trustee.

34.     On December 18, 2024, the Trustee filed a Motion for Turnover of Trust Property Against Abri and For an Accounting Pursuant to 11 U.S.C. §§ 542 and 105 (the "Turnover Motion").

35.     Pursuant to that Motion, the Trustee sought an order from the Court requiring Abri to turnover funds it received from the Debtors that were not authorized by the cash collateral orders and to provide an accounting of all funds it received from the Debtors post-petition and any uses thereof made for the account of the Debtors (or the Trust), and to account for any value rendered to the Debtors in exchange therefor.

36.     Abri responded to the Turnover Motion on February 3, 2025, objecting to the Trustee pursuing his claims through a Turnover Motion rather than an adversary proceeding. Abri asked the Court to deny and dismiss the Turnover Motion as improperly filed. The Trustee replied on February 26, 2025.

37.     After a status conference on February 27, 2025, the Court advised the parties via email on March 4, 2025, that, while the Turnover Motion could be handled as a contested matter, it would be more prudent for it to proceed as an adversary proceeding.

38.     Therefore, the Court instructed the Trustee to initiate an adversary proceeding that combined the issues in the Turnover Motion with any additional complaints the Trustee had regarding Abri.

39.     Pursuant to such instructions, the Trustee filed its Adversary Complaint on April 15, 2025, which he now amends based on new information learned since the original filing.

## IV.

## **FACTUAL BACKGROUND**

40.    Prior to May 1, 2024, the Debtors operated three skilled nursing facilities ("SNFs") and one assisted living facility ("ALF") in and around Killeen, Texas.

41.    On March 27, 2020, Abri purchased the equity of reorganized Senior Care Centers, LLC ("Senior Care"). Abri became the manager, sole member, and 100% owner of Senior Care.

42.    Within the Abri/Senior Care umbrella were the Killeen Facilities and Portfolio VIII.

43.    Portfolio VIII was the lessee under the master lease with Landlord. The Landlord owned the land on which the Killeen Facilities sat. Portfolio VIII sublet the land to the Killeen Facilities.

44.    The entity with the HUD operating license on each of the Killeen Facilities was Uvalde Memorial Hospital District ("Uvalde"). Uvalde had management agreements with each of the Debtors.

45.    The Landlord had a mortgage obligation to Key Bank National Association ("Key Bank"). Key Bank's loan was secured by the land on which the Killeen Facilities sat (that is, the Landlord's property).

46.    The loans from Key Bank were HUD-backed loans. Under the HUD-backed loans, Key Bank entered into Operator Security Agreements (the "OSAs") with the Debtors. The OSAs granted Key Bank a security interest in the Debtors' assets, including real estate, cash, accounts, and accounts receivable.

47.    Two other entities under the Abri umbrella, Fredericksburg and Edinburg, are relevant to this proceeding. On information and belief, Fredericksburg was owned by an entity controlled by one of Abri's largest equity owners, while Edinburg was owned by a third party not

related to Abri. Abri (through a subsidiary) managed the Edinburg Facility in the same manner as it did the Killeen Facilities.

48.    Abri provided corporate overhead and back-office services for all five facilities, allegedly pursuant to written management agreements.

49.    Under this arrangement it was not unusual for officers of Abri (the CEO and CRO for instance) to also serve as officers of the Debtors as well.

50.    On information and belief, all management functions of the Debtors were controlled by Frankl. On information and belief, Frankl's wife owns 45% of Abri, while Marvin Rubin owns another 45% of Abri. Nevertheless, Frankl essentially controlled directors, Diamond and Dershowitz, who in turn managed the Debtors by and through Abri's employees and officers, including Zutler and Hecht.[2] Dershowitz and Diamond were directors of Abri and each of the Debtors.

51.    Hecht was the CEO of Abri and the Debtors from at least March 2023 to January 12, 2024. Zutler functioned as an officer of the Debtors from September 2023 to January 2024. Frankl functioned as a shadow director and hired and used Zutler in a similar capacity as a shadow officer.

52.    As such, Diamond, Dershowitz, Zutler, and Hecht (each a "Fiduciary" and two or more, the "Fiduciaries") each owed the Debtors fiduciary duties of care and loyalty to act in the best interest of the Debtors and the Debtors' creditors because the Debtors operated in the zone of insolvency prior to bankruptcy and were insolvent in January 2024.

_____

[2] References to Abri in this factual background refer to Abri acting by and through its employees and officers, which would have initially included Hecht and Zutler.

53.    Frankl, in his capacity as a shadow director, owed a duty to refrain from causing Diamond, Dershowitz, Zutler, Hecht, and the other officers of the Debtors to breach their fiduciary duties.  By failing to do so, he became liable for participating in their breaches of fiduciary duties.

### A.  Frankl, Diamond, and Dershowitz Decide to Breach the Leases with the Landlord

54. As of December 2022, the Debtors had already been through two bankruptcies. Notwithstanding their emergence from bankruptcy, they were balance-sheet insolvent. Moreover, their cash flow was barely enough to sustain their operations and pay rent. Still, if managed properly, they could have bridged to a sound financial condition.

55.    The Debtors did not receive prudent management. Instead, those who controlled the Debtors made foolish decisions that were to have catastrophic consequences for the Debtors.

56.    The first critical error was the decision by Frankl, Dershowitz, and Diamond to discontinue rent payments to the Landlord. Frankl believed that the Debtors' rent obligation to the Landlord was above market. He decided to implement a strategy to compel the Landlord to sell one or more of the Killeen Facilities to Frankl or one of his affiliated entities at distressed prices. In pursuing this strategy, Frankl had no intent to benefit the Debtors or their creditors, but to pursue the opportunity for his own benefit.

57.    Frankl knew that the Landlord had executed mortgages on the Debtors' real estate in favor of the Landlord's lender, KeyBank. He knew that if the Debtors defaulted on their rent, the Landlord likely would default on its mortgage obligation to KeyBank. This would give Frankl the leverage to force the Landlord to sell one or more of the Killeen Facilities to Frankl or an affiliate.

58.    Not only would withholding rent money place undue pressure on the Landlord to come to terms, it would do one other thing. The withholding of the rent would permit Frankl and/or Abri to create a cash reserve that would be used to facilitate Frankl's purchase of the property.

59.     In December 2022, Frankl presented his plan to Dershowitz and Diamond. As directors, Dershowitz and Diamond approved the strategy and thereafter the Debtors' management team implemented it. From December 2022 to January 2024, neither Abri nor the Debtors made one regularly-scheduled rent payment to the Landlord. The lease obligations fell into default, thus accumulating the penalties called for by the leases.

60.     The consequences of the misguided decision to withhold rent were exacerbated by Abri's flawed cash management system. Abri caused receivables from government programs, such as Medicare and Medicaid, to be deposited into an account at CIBC under the name of Killeen II, with account numbers ending in 7640 ("HUD 7640"). HUD 7640 was a HUD concentration account. Although HUD 7640 should only have been used as a HUD concentration account for Killeen II, Abri caused deposits from ten different Abri-related entities to be deposited into this one account.

61.     This was to have disastrous consequences. As it so happens, Abri had embarked on a similar strategy of not paying rent on five other Abri-related entities known as the Slate entities. As a precursor of things to come, in May 2023, the Slate entities' landlord, CHI, put the Slate entities into receivership. The CHI/Slate receiver then sought control over all accounts holding money of the Slate entities. As a result, the CHI receiver caused all monies in HUD 7640 to be frozen.

62.     The Trustee has not been able to calculate the actual damage done to the Debtors by the improper commingling of the Debtors' money with that of the Slate entities. Those damages would include the money lost due to the inability to distinguish the Debtors' money from that of the Slate entities, as well as the legal expenses associated with untangling HUD 7640 from the Slate receivership.

63.     But, as the Debtors' chief restructuring officer Kevin O'Halloran ("O'Halloran") was to describe in his declaration in support of first day pleadings in the underlying bankruptcy cases, the CHI/Slate receivership would eventually lead to the Debtors' bankruptcy. O'Halloran described the events as follows:

I.     **Events Leading to the Filing of these Cases**

13.     Operations of SNFs across the country are and have been experiencing significant challenges and financial distress in recent years, especially with the Covid-19 pandemic's lasting effects of fewer employees and exponentially higher contract labor costs. The challenges faced by the Debtors are similar to those experienced by other SNF operators and are widespread within the skilled nursing industry. The Debtors faced increasing financial pressure caused by, among other things, declining reimbursement rates, difficulties in collecting accounts receivable, declining census and occupancy rates due to Covid, increasing lease obligations, outsized leases, tightening terms with various trade creditors, and exponentially increased nursing staffing and agency labor costs. All of these factors have combined to negatively impact the Debtors' operations and cash flow.

14.     In April 2023, a landlord ("CHI") filed a receivership over five (5) non-debtor facilities and Abri, and this Court ruled that the receivership could not include Abri. That receiver (the "CHI Receiver") required Abri's services and employees to operate the facilities until a transition could occur. This Court ordered the CHI Receiver and/or CHI to pay Abri for the services and employees Abri provides to the CHI Receiver. Abri managed those facilities for 86 days and on June 30, 2023, Abri transitioned management services of those facilities to the CHI Receiver. Abri's services totaled $1,952,277.01, which is undisputed by the CHI Receiver. The only payment the CHI Receiver has ever made to Abri was on August 9, 2023 in the amount of $400,000. Since July 1, 2023, Abri has been forced to continue to fund—over Abri's objection—the IT costs for the CHI Receiver's facilities, which has cost Abri $537,096.80. To date, the CHI Receiver and CHI have refused to pay Abri the $2,089,373.81 (and continues to accrue) still owes Abri.

15.     Due to the CHI Receivership, certain orders were issued to Abri's bank, CIBC, regarding the CHI facilities' bank accounts. Abri objected to the CHI Receiver's request to control the Debtors' HUD Concentration Account [HUD 7640], because that account has been used as

the central concentration account for all of Abri's HUD-related facilities since 2021. Despite the CHI Receiver not gaining access to the Debtors' HUD Concentration Account [HUD 7640]—and without notice to or knowledge by Abri—CIBC stopped the daily sweeps from the Debtors' HUD Concentration Account [HUD 7640], put post-no-debits ("PNDs"), and mistakenly removed Abri's ability to view the Debtors' HUD Concentration Account [HUD 7640] through Abri's banking portal.

16.     Historically all 245 bank accounts within the Abri group were swept daily into the central treasury. This daily sweep was then used by Abri to pay all facilities' expenses and payrolls.

17.     From May 2023 through December 2023, the Debtors' cash flow was woefully short, and prior management at Abri could not understand why; because the financial statements that Corporate Accounting were using reflected a higher cash balance (the funds in the HUD Concentration Account [HUD 7640]), yet the banking portal and daily treasury report did not include the funds in the HUD Concentration Account [HUD 7640] absent funding from Abri, the Debtors were unable to cover payroll, critical trade vendors, or pay their share of Corporate's employees and services that the Debtors required to operate and provide effective and continuous patient care. From May 2023 through January 9, 2024, Abri was funding the Debtors' shortfalls, which amount totaled $1,236,830.62 as of December 31, 2023.

18.     In or around June 2023, one or more of the individual owners of Abri began negotiations with the Debtors' landlord HC Hill Country Associates, Ltd., H-C Associates, Ltd., and HC-RW Associates, Ltd. (together, the "Landlord") to potentially purchase the real property on which the Debtors operate. The parties executed an LOI, but negotiations fell through in December 2023 when the Debtors were unable to pay the December debt service to the Landlord.

19.     Due to Abri Executive Management's perceived cash shortfalls at Abri (from the inability to view the HUD Concentration Account [HUD 7640], the CHI Receivership Debt, and covering the Debtors' shortfalls), Abri was unable to cover the Debtors' December debt service. The January debt service was also not paid.

20.     In early January 2024, the accounting team reviewed the reconciliation activity at all 245 bank accounts to see if any accounts still had any money in them. It was by this act that it was discovered that the HUD Concentration Account [HUD 7640] was hidden from view of Abri banking portal. In that HUD Concentration Account [HUD 7640] was $7,449,745.58—money that, but for the daily sweeps being stopped, would have been swept daily into the Abri central treasury and would have been

used in the ordinary course of business to fund the Debtors' operations, including the Debtors' share of Corporate employees, insurance, taxes, legal, and all other services provided by Corporate.

21.     Instead, because that $7,449,745.58 was not swept into the corporate treasury, the Debtors were unable to fund their operations, including their portion of Corporate, and Abri was forced to cover the shortfalls.

22.     When the HUD Concentration Account [HUD 7640] was rediscovered or about January 5, 2024, a massive sigh of relief washed over the entire Abri group. However, Abri still was unable to transfer finds [sic] from the HUD Concentration Account [HUD 7640], and so the accounting team requested that CIBC immediately transfer $13,291.44 to fund payroll for the Debtors and Corporate on January 8, 2024.

23.     On January 9, 2024, without notice to Debtors (or Abri as manager of Debtors), Landlord filed an emergency receivership motion in Bell County, Texas, the Receiver was appointed hours later.

24.     The timing of the Receiver's appointment could not have been worse from the perspective of patient safety and staff wages and salaries. Because the HUD Concentration Account [HUD 7640] was just rediscovered and the daily sweep had not been reactivated yet, when the Receiver was appointed, he sought control of the Debtors' HUD Concentration Account [HUD 7640]—which Abri disputed because that account held almost all moneys available to Abri and the Debtors—so CIBC froze the Debtors' HUD Concentration Account [HUD 7640]. It was now dire.

63.     Investigation by the Trustee has revealed that two aspects of O'Halloran's testimony are mistaken. First, while Frankl, Dershowitz, Diamond, Hecht, and Zutler may have "lost sight of" HUD 7640, Abri's comptroller, Michael Joseph ("Joseph") had not. At all times relevant to this complaint, Joseph had online access to all of the Debtors' accounts. Joseph could see that government receivables continued to be deposited into HUD 7640, then swept on a monthly basis into a HUD AP Funding account at CIBC with numbers ending in 0717 ("Account 0717"). Joseph could also see money being swept on a monthly basis into three commercial receivables accounts with numbers ending in 6026, 2322, and 2723 (the "Commercial A/R Accounts"). Joseph could see

the monthly accumulation of money in the Commercial A/R Accounts, which between June 2023 and January 2024 grew to in excess of $7.4 million.

64. It did not require any "investigation" to find the missing money. All that any of the officers or directors of Abri had to do was ask Joseph, which they finally did in January 2024. Joseph was immediately able to identify the "missing" money in the Commercial A/R Accounts.

65. The Trustee has not been able to substantiate O'Halloran's statement that Abri funded the Debtors' alleged shortfalls to the tune of $1,236,830.62. The Trustee denies that this happened. Upon information and belief, Abri used the Debtors' moneys to fund shortfalls at Fredericksburg and Edinburg.  After all, according to O'Halloran, Abri had no money except that which it received from the Debtors.

66. "Losing sight" of the money in the Commercial A/R Accounts—if that happened at all—was not the only mismanagement that led to the Debtors' eventual bankruptcies.

67. According to Abri, its management agreements with the Debtors called for a 5% management fee. But, it appears that instead of charging the agreed-upon management fee, Abri simply looked to the Debtors to pay all of Abri's overhead. This resulted in a management fee far in excess of the 5% fee. This is because of at least two factors. First, according to Kevin O'Halloran, two other entities under Abri's management, Fredericksburg and Edinburg, did not have sufficient resources to pay a management fee to Abri. So, Abri looked to the Debtors to support the management expenses of Fredericksburg and Edinburg.

68. As if that were not enough, Abri's overhead was bloated. According to O'Halloran, after the CHI/Slate receivership that resulted in a severe cash crunch, Abri should have downsized. It didn't. Instead, it increased the number of people in its clinical department and it increased the salaries of those in management. For example, the annual salary of the chief clinical officer went

from less than $200,000 to $350,000. Consultants were brought in. All of these expenses of Abri were borne by the Debtors at a time of financial crisis. As O'Halloran was to testify on February 5, 2024, "It was just total mismanagement."

68.     From December 2022 to January 2024, the Debtors accumulated at least $7.4 million in cash, most of which is attributable to Frankl's decision to withhold the Debtors' rent from the Landlord.

69.     By January 2024, the Landlord had enough. He instituted a receivership against the Debtors in Bell County, Texas.

70.     The Bell County Court appointed Guy Hohmann ("Hohmann") as receiver.

71.     On January 12, 2024, O'Halloran became the CRO for Abri and the Debtors.

72.     Upon his appointment, O'Halloran was told that shortly before his appointment, Abri had "discovered" at least $7.4 million in HUD 7640. In fact, on January 8, 2024, Abri had transferred the $7.4 million from the Commercial A/R Accounts to HUD 7640. So, it could not have just been "discovered" in HUD 7640.

73.     O'Halloran then told Hohmann that HUD *7640 was a "disputed" account, even though all money in the Commercial A/R Accounts belonged to the Debtors. But, had HUD 7640 been a disputed account it would have been grossly negligent for Abri to transfer the money from the Commercial A/R Accounts, which were not disputed, to HUD 7640, which was allegedly disputed.

74.     Whether the product of negligence, gross mismanagement, or intentional misrepresentation, the notion that the $7.4 million had just been found and was subject to dispute was not accurate. Moreover, the depiction of the $7.4 million as disputed was to have a lasting and devastating impact on the Debtors.

---

75.     Upon his appointment as receiver, Hohmann sought to take control of the Debtors' bank accounts in order to pay rent, vendors, payroll, and other expenses of the Debtors' operation. This included HUD 7640.  However, O'Halloran told Hohmann that he was the only authorized signatory on all Debtor accounts, and because HUD 7640 was "disputed," he could not agree to use funds from HUD 7640 for the Debtors unless Hohmann also agreed to release funds for Abri, Fredericksburg, and Edinburg.

76.     Hohmann asked for bank statements to support Abri's assertions that HUD 7640 was "disputed" but Abri denied him such access. Hohmann asked for budgets showing the capital needs for Abri but Abri denied him those as well. Instead, O'Halloran told Hohmann that the situation was critical. He alleged that Fredericksburg and/or Edinburg could not meet payroll without a cash infusion, and Abri purported to have no funds to cover its other facilities' overhead other than that which came from the Killeen Facilities.

77.     Rather than risk brinksmanship, Hohmann relented. Relying on the representations of O'Halloran on behalf of Abri, Hohmann authorized $867,439.39 to be paid out of HUD 7640 into a CIBC account in the name of Defendant Senior Rehab[3] with an account number ending in 6531 ("Account 6531").

78.     Hohmann also authorized Abri to transfer $238,319.60 to an account number ending in 3324 in the name of Fredericksburg. Moreover, on January 8, 2024, the day before the receivership, Abri caused $600,000 to be transferred from a PM Killeen account at CIBC with numbers ending in 0717 ("Account 0717") to Account 6531.

79.     Altogether, during the month of January 2024, prior to the filing of the bankruptcy cases, Abri caused $1,751,070.82 to be transferred out of the Debtors' accounts to accounts of or

---

[3] O'Halloran was also the CEO of Senior Rehab as well.

for the benefit of Abri and its affiliates, including Senior Rehab, Fredericksburg, and Edinburg. The Debtors received no value for the transfers to Senior Rehab, Fredericksburg, and Edinburg, and no or inadequate value for the transfers to Abri.

80.     Abri, Frankl, Dershowitz, Diamond, and Hecht knew that Abri was making transfers to Abri and its affiliates for which the Debtors received no or inadequate value.

81.     The perception and/or representation that HUD 7640 was a "disputed" account was due, at least in part, to the negligence (if not gross negligence) of Abri and Hecht (at least until January 12, 2024) as Abri's and the Debtors' CEO, Michael Joseph as Abri's chief accountant, and O'Halloran as CRO of the Debtors and Abri after January 12, 2024. The Debtors suffered damages in the amount of $1,751,070.82 because of this error.

## B.  Abri Continues to Mismanage the Debtors after Bankruptcy

82.     After the Debtors filed for bankruptcy, they immediately filed first-day motions. Among these was a motion to continue to use the Debtors' legacy bank accounts (the "cash management motion"). According to the Debtors, a cash management order was necessary to sustain the Debtors' operations because some of their accounts, such as HUD 7640, were HUD depository accounts and new HUD-approved DIP accounts could not be set up in a timely fashion. At the time of their bankruptcies, the Debtors had 14 accounts at CIBC.  While the Debtors set up three DIP accounts, they operated mostly out of their legacy accounts.  On any given day, a dizzying number of transfers were made into and out of the legacy accounts.

83.     After the Debtors filed bankruptcy, all cash in their bank accounts became the cash collateral of the Landlord's lender, Key Bank. The Debtors needed the cash collateral of Key Bank to sustain their operations. Additionally, Abri alleged that it was necessary for the Debtors to use cash collateral to pay Abri's overhead for managing the Debtors.

84.     O'Halloran testified that because of their dire situation, Fredericksburg and Edinburg could not afford to pay their fair share of Abri's expenses. Consequently, the Debtors alone would have to bear 100% of Abri's overhead. As O'Halloran explained when discussing the Abri budget, the amount in the budget was "the total amount and the Debtors' share." When asked why the Fredericksburg and Edinburg Facilities could not pay, O'Halloran said, "they do not have a surplus, do not have any cash."

85.     Significantly, neither Abri nor the Debtors sought authorization from the Court to pay the routine operating expenses of Fredericksburg and Edinburg (which relief the Court was certain to deny). Instead, they only sought authorization to reimburse Abri for its actual overhead.

86.     Regardless of the ability of Fredericksburg and Edinburg to share the burden of Abri's alleged overhead, there were other Abri affiliates who could also have contributed Frankl to Abri's overhead. For example, between January 1, 2024, and January 29, 2024, non-debtor affiliates Senior Rehab and Senior Care (via, respectively, CIBC accounts *2043 and *2051) deposited $739,596.97 into Account 6531. After the Debtors filed for bankruptcy, other Abri affiliates poured more than $3.3 million into Account 6531. Nevertheless, throughout the course of the bankruptcy cases, Abri caused the Debtors to fund 100% of its overhead as well as expenses of Fredericksburg and Edinburg that were not part of Abri's overhead.

87.     The only Abri-level budget ever provided to the Court and the creditors was the one it presented to the Court at the first-day hearing on February 5, 2024 (the "February 5 Budget"). The Trustee has asked Abri for the other budgets, but Abri has refused to provide them. The Trustee also asked for bank statements, most notably those for Account 6531, and again, Abri has refused. To this day Abri has never presented any evidence to demonstrate:

- The actual payroll at the Abri level;

- What Abri's actual overhead expenses were;

- How Abri calculated its own budget after the February 5 Budget;

- What Abri actually did with the money it caused the Debtors to send to it; or

- How the money sent by the Debtors to Abri was used for the Debtors' benefit, rather than for the benefit of Abri, Fredericksburg, and Edinburg, and/or other Abri affiliates.

88.     It is unclear whether Abri was so grossly negligent in its management of the Debtors post-petition that it cannot reconstruct how the Debtors' money was spent, or that it is deliberately withholding the truth.

## C. Abri Caused Debtors to Incur Unwarranted Charges for DKB Invoices

89.     A company called DKB provided software to support the operations of the Debtors, Abri, and many other Abri affiliates.

90.     According to O'Halloran, Abri had no source of revenue except that which it received from the Debtors. So, pursuant to the February 5 Budget, the Debtors were to pay Abri $46,002 each month for their own DKB usage, and reimburse Abri $82,420 each month for Abri's separate usage. The $46,002 calculation is highly suspect, given that the Debtors were only paying $4,860.08 per month for their share of DKB charges pre-petition. Moreover, after the Trust was created, the DKB budget went back down to $4,500 per month. Abri has yet to explain why the Debtors' alleged share of the DKB expense went up *tenfold* during the three months they were in control of the Debtors post-petition.

91.     The total budgeted amount for DKB during the course of the bankruptcy was $385,266 ($46,002 (the Debtors' portion) + $82,420 (Abri's portion that was reimbursed by the Debtors alone) = $128,422 per month x 3 months = $375,266). But the total amount the Debtors

paid to/for DKB during the bankruptcy case was $431,268. That is because Abri (either intentionally or negligently) charged the Debtors $46,002 for their portion *twice* in April 2024.

92.     Among the few instructive documents produced by Abri in response to the Motion for Turnover were DKB invoices for the three months the Debtors were in bankruptcy. Those invoices were in the following amounts: February $115,298.14, March $112,120.44, and April $110,857.72, for a total of $338,276.30, meaning that Abri collected from the Debtors $92,991.70 *more* than DKB actually invoiced Abri. So, during the course of the bankruptcy, Abri caused the Debtors to pay 127% of the DKB invoices.

93.     In addition to causing the Debtors to pay 127% of the actual invoices, Abri also caused the Debtors to pay for forty-two servers they did not use and did not need. It is reasonable to assume that each of the Killeen facilities needed a DKB server. O'Halloran testified that Abri also needed its own server. Therefore, at most, the Debtors' operations required *four* servers. But, according to the DKB invoices, the Debtors paid for *forty-six* servers! As such, the Debtors were using 8.69% of the servers under the Abri umbrella, but they were paying 127% of the total cost.

94.     Abri's improper allocation of the DKB expense burden did not end with the monthly service charges. According to Anthony Arnaudi, Abri also charged the Debtors $37,830 each month for DKB Software Support and Licensing.

95.     When Abri sought authorization from the Court to use cash collateral to pay the DKB expense, it never mentioned the Software Support and Licensing expense. Consequently, Abri was never authorized to use the Debtors' cash to pay for this expense. Accordingly, Abri must reimburse the Debtors $113,490 for its unauthorized use of the Debtors' cash to pay for the DKB Software Support and Licensing fee.

96.    Accordingly, Abri charged Debtors: $92,991.70 in excess of actual DKB invoices, and wrongfully charged Debtors $293,962.10 due to the improper allocation of the DKB expense burden, and $113,490 for unauthorized software and licensing fees, for a total of $490,443.86. These payments were out of the ordinary course of business and constitute violations of the cash collateral orders.

### D. Abri Pays Itself Hundreds of Thousands of Dollars in Excess of the Cash Collateral Budgets.

97.    As set forth above, on February 6, 2024, the Court entered an interim order allowing the Debtors to use Cash Collateral[4] through February 20, 2024. *See* Dkt. 53 (hereinafter, the "First Interim Order") at ¶ 7.

98.    Between February 20, 2024, and April 4, 2024, the Court extended its interim authorization for Debtors' use of Cash Collateral multiple times. *See* Dkts. 93, 108 (the "Second Interim Order"), 128 (the "Third Interim Order"), and 143 (the "Fourth Interim Order").

99.    On April 26, 2024, the Court granted final approval for use of Cash Collateral. *See* Dkt. 201 (the "Final Order") (the First, Second, Third, and Fourth Interim Orders, and Final Order, shall hereinafter be collectively referred to as the "Cash Collateral Orders").

100.   In the Cash Collateral Orders, the Court authorized the Debtors to pay certain budgeted amounts to Abri. However, during the months of February, March, and April of 2024, Abri caused Debtors to pay far more than what had been budgeted.

101.   Most of these transfers or overpayments were never reported to the Court or to the Trustee, even retroactively in subsequent budgets. In total, ***Abri drew an extra $2,357,929.41 from the Debtors beyond what the Court authorized*** and that which was disclosed to the Court.

---

[4] As defined in the First Interim Order at ¶ 3(c).

---

102.    On December 18, 2024, Plaintiff filed a Motion for Turnover, wherein the Trustee asked the Court to compel Abri to turn over amounts that Abri withdrew in excess of the cash collateral budgets.

103.    In Abri's Response to Liquidating Trustee's Motion for Turnover and Accounting (the "Response"), Abri attempted to account for its withdrawal of $2,357,929.41 in excess of the cash collateral budgets.

104.    Of this amount, Abri noted $350,000 was for the Touchstone Indemnity (which the Trustee had already conceded), $150,000 for the Abri servicing for May 2024 (which the Trustee had already conceded), and $138,006 (three payments of $46,002 for DKB, which were in fact in the budget but greatly exceeded the Debtors' proper allocation) for a total of $638,006.

105.    The Trustee also acknowledges that in May 2024, Abri returned to Account 0717 the sum of $811,331.50, which could be characterized as a return of excess withdrawals.

106.    Although Abri purported to explain its use of excess withdrawals, Abri never provided any evidence to demonstrate that those expenses were not already in Abri's budgeted overhead (for which it was paid) or that the expenditures were for the benefit of the Debtors (rather than other Abri entities), or that Abri actually paid the expenses after taking the money out of the Debtors' account.

107.    Consequently, of the $2,357,929.41 sought in the Motion for Turnover, Abri has accounted only for $1,449,337.50, leaving $908,591.91 unaccounted for.

108.    After filing the Motion for Turnover, the Trustee discovered from sources other than Abri that part of the missing money, $113,490, was spent on unauthorized charges for the DKB Software Support and Licensing Fee.

109.    Additionally, the Trustee has discovered that (1) during the week of March 8, 2024, Abri used $194,119 of the Debtors' money to pay the payroll of Fredericksburg; (2) during the week of March 29, 2024, Abri used $6,968.92 to pay the utilities of the Fredericksburg Facility; and (3) during the weeks of April 12 and April 23, 2024, respectively, Abri used $193,457.87 and $188,277 to pay the expenses of Edinburg.

110.    Under 11 U.S.C. § 363(c)(1), a debtor-in-possession may use its cash in the ordinary course of business without notice or a hearing. However, using property of the estate to pay the obligations of non-debtors is never in the ordinary course of business and must be approved by the Court. Moreover, under 11 U.S.C. § 363(c)(2), a debtor may only use cash collateral – whether in the ordinary course of business or otherwise – if the lienholder consents or the court authorizes such use of cash collateral. Here, except for the actual overhead of Abri, KeyBank did not consent to and the Court did not authorize the use of KeyBank's cash collateral for any purpose other than to reimburse Abri for its actual overhead in managing the Debtors. Accordingly, all sums over and above Abri's actual and substantiated overhead must be returned to the Trust.

## V.

## CAUSES OF ACTION

### COUNT ONE: REQUEST FOR TURNOVER AND ACCOUNTING
**Against Abri, Fredericksburg, Edinburg, Senior Rehab,
and Senior Care (the "Turnover Defendants")**

111.    The Trustee incorporates the factual allegations from the preceding paragraphs as if set forth herein verbatim.

112.    Pursuant to 11 U.S.C. §§ 363(c)(1)-(2), 542(b) and the Court's equitable powers under 11 U.S.C. § 105(a), the Trustee requests that the Court compel the Turnover Defendants to turn over to the Trust the sum of $1,285,545.77 consisting of: $490,443.86 attributable to

unauthorized and improperly allocated expenses of DKB; $194,119 that the Turnover Defendants caused the Debtors to pay for the payroll for Fredericksburg; $6,968.92 that the Defendants caused the Debtors to pay for Fredericksburg's utilities; $381,734.87 that the Turnover Defendants caused the Debtors to pay to Windcrest; and a further $212,279.12 that Abri has refused to account for. The Trustee believes that his request for turnover will increase after discovery due to Abri's improper payment of non-Debtor expenses.

113.    Pursuant to section 542(a) of the Bankruptcy Code, any party in possession of property of a bankruptcy estate is obligated to "deliver to the trustee, and account for, such property or the value of such property." Similarly, under section 542(b), the Court may order a party that owes a matured debt to the estate to pay such debt on demand. Section 105 of the Bankruptcy Code authorizes the Court to enter any necessary orders to enforce parties' obligations under the Bankruptcy Code, which would include the turnover obligations under section 542.

114.    The above authorities are applicable to the transfers and overpayments the Turnover Defendants received from the Debtors because such funds were property of the Debtors' estate.

115.    The Court should therefore order the Turnover Defendants to turn over all the transfers and payments identified so far and those yet to be discovered.

### COUNT TWO: TORTIOUS INTERFERENCE
### Against Frankl, Diamond, and Dershowitz (the "Tortious Interference Defendants")

116.    The Trustee incorporates the factual allegations from the preceding paragraphs as if set forth herein verbatim.

117.    Frankl is and at all relevant times acted as a shadow director of Abri, which is the parent of the Debtors and controls the Debtors.

118.    Diamond and Dershowitz were at all relevant times members of the board of directors of Abri and the Debtors.

---

119.   Upon information and belief, Diamond and Dershowitz were, at all times relevant to this complaint, controlled by Frankl and encouraged to place his interests above those of the Debtors .

120.   Upon information and belief, Frankl is not personally an owner of Abri.

121.   The Debtors' contractual obligation to pay rent was known to each of Frankl, Diamond and Dershowitz.

122.   Upon information and belief, Frankl, Diamond and Dershowitz, working in concert, tortiously interfered with Portfolio VIII's contracts with the Landlord and with Killeen I's, Killeen II's, and Killeen III's contracts with Portfolio VIII for the express purpose of benefitting themselves or their affiliates, leveraging the Landlord into selling the Landlord's real estate either to themselves or one or more of their affiliates to the detriment of the Debtors.

123.   The decision to withhold the rent was not made because Abri and the Debtors lacked the funds to pay the rent, nor were the funds used to pay other creditors.

124.   The decision to withhold rent directly and foreseeably caused (1) the acceleration of the rent obligation to $5.7 million and (b) the appointment of Hohmann as receiver.

125.   Once Hohmann was appointed, the tortious interference continued. Instead of using the $7.4 million to extinguish the $5.7 million debt to the Landlord, the Tortious Interference Defendants caused, permitted, or instructed O'Halloran to tell Hohmann that HUD 7640 was a disputed account.

126.   Moreover, instead of causing Debtors' funds to be paid to the Landlord and Debtors' legitimate creditors, the Tortious Interference Defendants caused those funds to be used to pay the obligations of Abri and its affiliates. At a time of dire necessity, the Debtors could hardly afford to have $1.7 million of their funds used to pay the obligations of Abri's affiliates.

127.    The tortious actions of Frankl, Diamond and Dershowitz, working in concert with and through Abri led directly and foreseeably to the bankruptcy filings of the Debtors, causing the Debtors actual damages in the form of lost moneys and lost value as going concerns.

128.    On information and belief, and given the information pled herein, Frankl, Diamond and Dershowitz's actions were wanton and malicious, and done for the purpose of promoting Frankl's interests over the interests of the Debtors.

### COUNT THREE: NEGLIGENCE AND GROSS NEGLIGENCE
### Against Abri, Frankl, Hecht, Zutler,
### Diamond and Dershowitz (the "Negligence Defendants")

129.    The Trustee incorporates the factual allegations from the preceding paragraphs as if set forth herein verbatim.

130.    Prior to their bankruptcies, the Debtors were operated and controlled by their 100% owner/operator, Abri, through Abri's employees and duly appointed officers, some of whom were also officers of one or more of the Debtors.

131.    Abri owed the Debtors a duty to act as a reasonably prudent manager and to exercise reasonable care and diligence in the management of the Debtors' businesses. Abri breached its duty to the Debtors.

132.    Defendant Hecht served as the CEO of Abri and the Debtors from at least March 2023 to January 2024. During this period, Hecht caused or permitted the funds of other Abri affiliates to be commingled with the Debtors' funds in HUD 7640. When the CHI/Slate receivership was filed in May 2023, HUD 7640 was frozen due to this commingling. The Debtors not only lost access to the funds in HUD 7640 until that account could be delinked from the Slate entities, but they incurred the legal expense of freeing HUD 7640 from the CHI/Slate receivership. Due to the CHI/Slate receivership, CIBC removed HUD 7640 from the Abri banking platform.

133.    According to O'Halloran, Abri and the Debtors lost track of HUD 7640 from May 2023 until January 2024. Even if HUD 7640 was removed from the Abri banking platform, the exercise of reasonable diligence would have shown that HUD deposits were being made into HUD 7640, then swept into Account 0717. Significant portions of that money were then transferred to the Commercial A/R Accounts. Between June 2023 and January 2024, more than $7.4 million accumulated in the Commercial A/R Accounts.

134.    During a period of time when the Debtors were in a severe cash crunch, Hecht lost track of $7.4 million. At the same time, Hecht failed to respond to the crisis at hand. Instead of instituting cost-saving measures, Hecht hired new clinical staff for Abri, increased the salaries of officers and employees at Abri, and then passed along the extra overhead as a management fee to the Debtors.

135.    Additionally, Hecht implemented the Tortious Interference Defendants' decision to not pay rent to the Landlord, thus leading to the receivership of the Debtors. Upon information and belief, during her tenure as CEO, Hecht authorized and directed the Debtors to pay the expenses of Fredericksburg and Edinburg for no consideration to the Debtors.

136.    Once the receivership was filed, Hecht endorsed the story that the money in HUD 7640 was "disputed," thus leading to the use of the Debtors' funds to fund the operation of Edinburg and Fredericksburg. These actions and inactions constitute negligence or gross negligence, for which Hecht and Abri are liable.

137.    Defendant Zutler worked for Frankl and acted on behalf of Abri in a supervisory role over the Debtors from September 2023 to January 2024. Zutler was retained by Sutherland Care Solutions LLC, a company owned by Frankl. According to Hecht, Zutler, everyone at Abri was reporting to Zutler as if he were the true CEO or board of directors.

138.    Diamond and Dershowitz were board members of Abri and the Debtors. As such, they owed duties of care and loyalty to the Debtors. Diamond and Dershowitz breached their duties to the Debtors and were either negligent or grossly negligent in doing so. At a time when the Debtors were insolvent or in the zone of insolvency, Diamon and Dershowitz:

(a) caused the non-payment of the rent to the Landlord;

(b) permitted the commingling of the Debtors' funds in HUD 7640 with those of the Slate entities;

(c) lost track of or hid money that ended up in the Commercial A/R Accounts;

(d) paid Abri's senior officers "astronomical salaries" and then passed along those costs to the Debtors;

(e) allowed the Debtors' money to be used to pay the expenses of Abri affiliates;

(f) failed to institute cost-saving measures when the Debtors were in financial distress;

(g) caused the Debtors to pay for 100% of Abri's overhead before and during the bankruptcy;

(h) permitted Abri to overcharge the Debtors for DKB services during the bankruptcy;

(i) permitted Abri to pay the expenses of Fredericksburg, Edinburg, and other Abri entities during the bankruptcy; and

(j) permitted Abri to transfer funds from the Debtors' accounts post-petition in excess of that which was allowed under the Cash Collateral Orders.

139.    The foregoing acts of negligence proximately caused damages to the Debtors.

140.    The Negligence Defendants' conduct further constituted gross negligence because, when viewed objectively from the Negligence Defendants' standpoint at the time of the events, the acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and the Negligence Defendants had actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including the Debtors. The individual Negligence Defendants were acting as agents of Abri, and their gross negligence is imputed to Abri.

141.    Debtors therefore seek exemplary damages from the Negligence Defendants in addition to their actual damages.

### COUNT FOUR: BREACH OF FIDUCIARY DUTIES
### Against Abri, Hecht, Diamond and Dershowitz,
### Frankl, and Zutler (the "Fiduciary Defendants")

142.    The Trustee incorporates the factual allegations from the preceding paragraphs as if set forth herein verbatim.

143.    From at least December 2022 to January 2024, the Debtors were in the zone of insolvency because even though cash was sufficient to meet current obligations, any negative change in the cash flow would foreseeably lead to insolvency, and because the Debtors' balance sheets reflected that liabilities overall exceeded assets.

144.    From January 2024 to May 2024, the Debtors were insolvent and then in bankruptcy.

145.    As such, at all times relevant to this complaint, Abri and its officers and directors, including Diamond and Dershowitz, were obliged to act in the best interests of the Debtors and their creditors.

146.    As the manager of the Debtors, Abri, via its officers, acted as officers of the Debtors and, therefore, owed the Debtors fiduciary duties, including, but not limited to, the duty of loyalty and the duty of care.

147.    Moreover, Defendant Hecht was an officer of the Debtors and, as such, also owed the Debtors those same fiduciary duties.

148.    Diamond and Dershowitz were directors of the Debtors and, as such, owed fiduciary duties to the Debtors.

149.    The Fiduciary Defendants breached their fiduciary duties to the Debtors by, among other things,

    (a) favoring the interests of Frankl, Abri, and/or Marvin Rubin over those of the Debtors and their creditors;

    (b) failing to pay the rent, thereby causing the receivership and eventual bankruptcies of the Debtors;

    (c) commingling the Debtors' funds with those of the Slate entities;

    (d) using the Debtors' funds to sustain Fredericksburg, Edinburg, and other Abri affiliates;

    (e) increasing Abri's staff and paying Abri's senior officers "astronomical salaries" and causing the Debtors to pay those salaries;

    (f) failing to downsize after the CHI/Slate receivership;

    (g) causing the Debtors' receiver to use the Debtors' money to pay 100% of Abri's overhead prior to bankruptcy;

    (h) causing the Debtors to pay for 100% of Abri's overhead during the bankruptcy;

    (i) causing the Debtors to pay the expenses of Fredericksburg and Edinburg (and possibly other Abri affiliates) before and during the Debtors' bankruptcies;

    (j) overcharging Debtors for DKB services during the bankruptcy;

      (k) transferring funds from Debtors' accounts post-petition in excess of that which was allowed under the Cash Collateral Orders.

150.    The foregoing acts constituted breaches of the Fiduciary Defendants' duties of care and loyalty.

151.    Although not an owner, Frankl operated as a shadow director, telling the Directors what to do and working with them to come up with and enforce the plan to withhold the funds, and upon information and belief, planning and scheming the Abri to misuse funds and to misappropriate Debtors funds for other Abri expenses.

152.    Upon information and belief, Frankl knew that the Debtors' businesses were operating on a razor thin cash flow line. Abri had recently been in bankruptcy. Other assets similar to the debtors had been put into receivership. So, Frankl was aware that given each Debtor's balance sheet, and each Debtors' razor thin cash situation meant that each was operating in the zone of insolvency.

153.    Upon information and belief, and according to former insiders, Frankl was also behind the decisions and scheme to appropriate the funds that belonged to the Debtors and use them for other Abri expenses, even though those funds had never been authorized to be used by the Court.

154.    As such, by taking the foregoing actions when the Debtors were in the zone of insolvency, Frankl knowingly participated in the breaches of fiduciary duty of Abri, Diamond and Dershowitz, by instructing them or otherwise conspiring and jointly coordinating with them to cause the rents to be withheld.

155.    Upon information and belief, Zutler was Frankl's man on the ground, acting on his behalf and enforcing his instructions not only as to the rents, but also as to the other uses of cash for non-Debtor purposes.

156. Upon information and belief, Zutler was also well aware of the financial situation of the Debtors between 2022 and the filing of the bankruptcy, and was aware of the purpose and intent of withholding the rents, misappropriation of funds, and redirection of moneys to non-authorized non-Debtor purposes.

157. As such, by taking the foregoing actions when the Debtors were in the zone of insolvency, Zutler knowingly participated in the breaches of fiduciary duty of Abri, Diamond and Dershowitz, by instructing them or otherwise conspiring and jointly coordinating with them to cause the rents to be withheld and for the moneys to be improperly redirected away from Debtors and their creditors.

158. The breaches resulted in damages to Debtors. Those damages included but are not limited to: the funds Abri wrongfully appropriated from Debtors for its own benefit, for the benefit of Abri affiliates such a Frankl, Diamond or Dershowitz or their affiliates, as well as Fredericksburg and Edinburg. The breaches also resulted in the loss of Debtors' businesses as going concerns.

### COUNT SIX: AVOIDANCE OF SECTIONS 544(B) AND 548
### TRANSFERS AND, ALTERNATIVELY, 547 TRANSFERS
### Against Abri, Fredericksburg, Edinburg, and Senior Rehab (the "Avoidance Defendants")

159. The Trustee incorporates the factual allegations from the preceding paragraphs as if set forth herein verbatim.

160. Pursuant to 11 U.S.C. §§ 544(b) and 548 and/or applicable Texas law (such as the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.001 et seq.), the Trustee may avoid any transfer or obligation, and recover any transfer of property of the Debtors, made without receiving reasonably equivalent value in exchange for the transfer when the Debtors were insolvent at the time or became insolvent as a result of the transfer, or where the Debtors knew or should have known that they would incur debts beyond their ability to pay as such debts matured.

161.    The known transfers subject to this count are the transfers by Abri to itself and/or its affiliates (including, without limitation, Fredericksburg, Edinburg, and Senior Rehab) of $1,751,070.82 of Debtor funds in January 2024, but may also include other such transfers made within four years of the Petition Date should other facts be discovered.

162.    At the time the subject transfer(s) were made, the Debtors were insolvent and/or became insolvent as a result of such transfer(s) and/or knew or should have known that they were incurring or would be incurring debts beyond their ability to pay as such debts matured, and/or that such transfer(s) would impair the Debtors' businesses, operations, and viability going forward.

163.    The Debtors did not receive reasonably equivalent value on account of such transfer(s), whether for the purported services performed by Abri or otherwise during this time.

164.    Alternatively, the transfers were made with an actual intent to hinder or delay creditors, and Defendants were not good faith transferees of such transfers.

165.    Pursuant to 11 U.S.C. §§ 544(b), 548, and 550 and/or applicable Texas law, the Trustee seeks judgment against the Avoidance Defendants (i) ruling that the transfers are avoidable; (ii) avoiding the transfers; (iii) entering judgment against the Avoidance Defendants for the value of the transfers, plus interest and costs of suit; and (iv) for any other relief the Court deems appropriate.

166.    Alternatively, if the Avoidance Defendants contend that any portion of the subject transfers were on account of antecedent debts owed by one or more Debtors to the Avoidance Defendants, such transfers are avoidable and recoverable pursuant to 11 U.S.C. § 547 and/or Tex. Bus. Com. Code § 24.006.

**COUNT SEVEN: RECOVERY OF AVOIDABLE
POST-PETITION TRANSFERS UNDER SECTION 549
Against Abri, Fredericksburg,
Edinburg, Senior Rehab, and Senior Care (the "549 Defendants")**

167.    The Trustee incorporates the factual allegations from the preceding paragraphs as if set forth herein verbatim.

168.    Under 11 U.S.C. § 549(a), the Trustee may seek the avoidance of any transfer of property of the estate that (1) occurred after the commencement of the case and (2) that was not authorized under Title 11 or by the Court. The Trustee seeks the avoidance of all transfers made or caused to be made by Abri after the commencement of the cases, which: (1) were outside the ordinary course of business and not approved by the Court (in violation of 11 U.S.C. § 363(b)-(c); and/or (2) constituted the cash collateral of KeyBank, but were never approved by KeyBank or the Court, including, but not limited to:

  (a) any Abri overhead expense that was not an actual overhead expense of Abri and not approved by the Court and/or KeyBank;

  (b) any moneys used to pay routine operating expenses of Edinburg and Fredericksburg, including without limitation, payroll, staffing, utilities, rent, vendors, food, equipment, maintenance, and the like (including, without limitation, $194,199 for payroll at Fredericksburg, $6,968.92 for utilities at Fredericksburg, and $381,734.87 for unknown expenses at Edinburg);

  (c) all DKB expenses improperly charged to the Debtors to pay DKB, including without limitation: all amounts improperly allocated to the Debtors (whether mistakenly approved by the Court or not); all payments made for DKB that exceeded the actual cost of DKB service; and all payments made for DKB that exceeded the amounts permitted in cash collateral budgets; and

(d) all payments Abri caused to be paid to itself, Senior Rehab, Senior Care, or others,

for which it has failed to account.

## COUNT EIGHT: RECOVERY OF AVOIDED TRANSFERS UNDER SECTION 550
### Against Abri, Senior Rehab, Fredericksburg, Edinburg, and Senior Care

169.   The Trustee incorporates the factual allegations from the preceding paragraphs as if

set forth herein verbatim.

170.   Further, or in the alternative, the Trustee is entitled to avoid the transfers discussed

above pursuant to, sections 547, 548, and 549 of the Bankruptcy Code.

171.   Abri, Senior Rehab, Fredericksburg, Edinburg, and Senior Care were the initial,

immediate, or mediate transferees of the transfers, or they were the parties for whose benefit the

transfers were made.

172.   Therefore, for any transfers avoided under any of the Trustee's causes of action

under sections 544, 547, and 549 of the Bankruptcy Code, the Trustee requests a judgment for

recovery of the transferred property or for damages of equivalent value from Abri, Senior Rehab,

Senior Care, Fredericksburg, and Edinburg.

## COUNT NINE: CONDITIONAL REQUEST FOR RELIEF
### FROM CASH COLLATERAL ORDER

173.   The Trustee does not construe that Final Order Pursuant to 11 U.S.C. §§ 105, 361,

362, 363(c)(2), and 507 (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate

Protection, (III) Modifying the Automatic Stay; (IV) Setting a Final Hearing, and (V) Granting

Related Relief (Main Case Dkt. 201, entered April 26, 2024), its prior interim orders, or any budget

promulgated under any of them (collectively, the "Cash Collateral Order") to provide any defenses

to any of the Defendants with respect to the propriety or non-propriety of the handling of the

Debtors' funds or other assets during or prior to the pendency of the referenced chapter 11 cases.

174.    However, out of an abundance of caution only, if and to the extent any of the

Defendants seek to assert such protections or other defenses based upon such Cash Collateral Order,

the Trustee seeks relief from such order(s) pursuant to Rules 60, Fed. R. Civ. P., as adopted by

Bankruptcy Rule 9024, Fed R. Bankr. P.

## VI.

## **REQUESTED RELIEF**

All conditions precedent to the requested relief have been satisfied.

The Trustee respectfully prays that the Court enter judgment granting the relief requested

herein and that: (1) he be awarded his reasonable attorneys' fees and costs as may be available

under state or federal law or in contract; (2) he be granted pre- and post-judgment interest at the

maximum rate allowed by law; and (3) that he be granted such other further relief to which he is

justly entitled in equity or in law.

Dated: July 21, 2025                    Respectfully submitted,

                                        SBAITI & COMPANY PLLC

                                        */s/ Mazin A. Sbaiti*
                                        Mazin A. Sbaiti
                                        Texas Bar No. 24058096
                                        mas@sbaitilaw.com
                                        Kevin N. Colquitt
                                        Texas Bar No. 24072047
                                        knc@sbaitilaw.com
                                        2200 Ross Avenue, Suite 4900W
                                        Dallas, Texas 75201
                                        T: (214) 432-2899
                                        F: (214) 214-3400

                                        ***Counsel for Russell F. Nelms, Liquidating Trustee***